Theresa Bailey

Against

New York Law School, Anthony Crowell
Deborah Archer, Howard Meyers,
Jeffery Becherer, Erika Wood

**16-CV-04283**
Hon. Edgardo Ramos

**AMENDED
COMPLAINT
JURY DEMANDED**

## I.   Parties:

A.          **Plaintiff**          Theresa Bailey
                                    1809 7th Avenue, Apt. No. 4D
                                    New York, NY 10026
                                    (917)484-0865

B.          **Defendants**



Defendant No. 1  New York Law School
                 185 West Broadway
                 New York, NY 10013
                 (212) 431-2123

Defendant No. 2  Anthony Crowell
                 185 West Broadway
                 New York, NY 10013
                 (212) 431-2840

Defendant No. 3  Deborah Archer
                 185 West Broadway
                 New York, NY 10013
                 (212) 431-2138

Defendant No. 4  Howard Meyers
                 185 West Broadway
                 New York, NY 10013
                 (212) 431-2338

Defendant No. 5  Jeffery Becherer
                 185 West Broadway
                 New York, NY 10013
                 (212) 431-2345

Defendant No. 6  Erika Wood
                 185 West Broadway
                 New York, NY 10013
                 (212) 431-2397



## II.   Basis for Jurisdiction:

A.   **Federal Question:**
B.   Title IX; 42 USC § 1983

## III.   Statement of Claim:

A.   The incidents occurred in the state of New York, NY
B.   The allegations arise from an incident occurred October 6, 2014, approximately 7pm

1

**Facts:**

1. I, Theresa Bailey, am a resident of New York State, and was a New York Law School student from August 2012 to May 2016. I am a woman of color, U.S. Citizen, and Marine veteran. I'm from a low-income home, where I was molested, and eviction notices and the lights being cut off were common. I've been raped. I've been held at gun point for oral sex in the building where I am now. Education was my way out of a prison made of poverty and gender-based violence. I swore an oath to die for my country, and gave blood, sweat and tears, for education funds. I am here pro se because I am unable to pay an attorney. Defendants' misconduct was so oppressive that my sole relief this last year has been maintaining a kill (suicide) date. Defendants dismissed multiple opportunities to correct legal violations, forcing me to reach out to the offices of POTUS, Civil Rights, Mayor, U.S. District Attorney, Legal Disciplinary Committee, and finally the court for relief.

2. New York Law School's main campus is 185 West Broadway, New York, NY, where the incidents occurred. This action is against the school and all five named defendants individually and in their employed capacities, due to their role in handling this incident. Defendants are experts in law, and recognize the rights, duties, and liabilities of the involved parties, and used that skill to obstruct justice after a campus attack.

3. Anthony Crowell, is the NYLS Dean; Deborah Archer, is the Dean of Diversity & Inclusion, and Director of the Racial Justice Project, and the acting chair of the NYC Civilian Complaint Review Board; Howard Meyers, is a professor, and Associate Director, for the Center for Business and Financial Law; Jeffery Becherer, is the Associate Dean for Career Planning; Erika Wood, is a professor. I relied on their legal skill to redress my injuries.

4. Defendant is a Title IX funding recipient; and I am a beneficiary of Title IX protection, as a woman and person of color. NYLS Registrar Dean Oral Hope, Title IX coordinator Victoria Eastus, and Director of Student Life Sally Harding met with me Oct 7 at the time I made the initial complaint. I reported being attacked at NYLS outside the bathrooms by a white male student who had his pants down and was clearly on drugs, and that I had avoided this student based on observations of him with women on campus. (2012, I made a complaint on an NYLS survey of harassing conduct by campus security, so I did not feel safe speaking with security after my attack. An NYLS alum suggested I speak with Hope.)

5. Oct 7, at NYLS's main campus, in Hope's office, in response to my numerous direct safety questions, Hope said my attacker was no longer at NYLS. On or about Oct 10, Eastus characterized my attacker, Stephen Nesbit, as "well-liked" and "good" and said that NYLS had no other complaints about Nesbit. (In fact, Nesbit had been reported by a female August 2014; the male who rescued me Oct 6, made a complaint that night, as well as a female who also reported Nesbit Oct 6. My complaint on Oct 7, was the **fourth** complaint on Nesbit to NYLS.) Had those statements been true, NYLS's response likely would not have been intentional or reckless but negligence.  Oct 23, 2014, Nesbit was brought back to NYLS. Oct 23 I filed police complaint

against Nesbit, but was told the corroborating evidence was too stale for the police to act on.

6. Oct 26, 2014, I informed Crowell and Archer of the incident via email. Oct 27, I met with Archer; Crowell did not respond to my email. Archer was hostile and suggested I failed to report the incident to an appropriate employee, but said she knew of the incident. I didn't speak with Crowell until April 2015, when I stopped him in a crowded cafeteria. (He said his secretary would schedule time for us to meet. she scheduled a meeting for June. During the meeting Crowell kept up the NYLS sham of addressing my incident by including Ella Mae Estrada from the Admissions Office, who was supposed to aid my transfer. I met with Estrada that day, and she next messaged me the day after transfer applications were due in July.)

7. Nov 25, 2014, NYLS's Harassment and Discrimination Review Board (HDRB) findings showed that I was the **fourth** person on record to report Nesbit to NYLS, contradicting what I had been told from Oct 7 until Nov 24. I appealed the sanction highlighting the misrepresentations and acts of bad faith by NYLS.

8. April 2015, a month shy of Nesbit's graduation, the Board held a hearing at NYLS, which again revealed evidence that the Board's process was a sham, and lacked good faith. I objected both verbally and in writing in detail, citing inconsistencies in the evidence relied on by the Board, including that Nesbit lied on his safety risk evaluation, contradicting the Board's own findings on intoxication and incident reports, and Nesbit failed to participate in the hearings, so that he was never questioned at the hearing, and the inconsistencies were not explored. Also, the unreasonable delay (the hearing was a month before Nesbit's 2015 graduation).

9. I sought help from NYLS to transfer law schools specifying the distress caused by the school's response to the incident. My transfer application was returned unread because I didn't get a letter of recommendation from NYLS, which forced me to remain on the campus where I was attacked or lose money already paid by withdrawing from NYLS. My options were stay or leave and not complete less than a year to get a degree.

10. After I criticized NYLS's conduct, and my transfer failed, my grades awarded by NYLS were the lowest of my law school career, which placed me in danger of not graduating on time, unless, in my last semester, I performed better than I ever had done before in law school, further compounding my distress.

11. I requested that NYLS investigate to rule out retaliation citing the grades and describing in detail maltreatment by two NYLS professors: Barbara Graves-Pollar and David Schoenbrod. To date, I have no knowledge that NYLS investigated any of my submitted claims against NYLS employees nor have I been granted any relief.  I was forced to pay for an additional class to make up the failed class to get the degree.

**IV. Injuries:** Severe emotional distress from defendants' intentional and persistent failure to respond reasonably to complaints that a white male posed a threat to me as a woman, worsened by defendants' ongoing misrepresentations, undue delay, and bad faith dealings. Diversity and faculty reputations are core inducements in defendants' advertising and marketing of its services to diverse (minority) applicants, on which I relied, and paid $238, 038 in loans, which accrues interest daily. Defendants' bad faith rises to the level of fraud and duress, and adversely affected my bargaining power in selecting and remaining at NYLS. I suffer panic attacks, aggressive reactions in response to ordinary and incidental touching, and suicidal inclinations, which forced me to leave my job to preserve my professional reputation, resulting in my insolvency. Before, a licensed gun and my military training made me feel safe; today, I am a Marine, subject to active duty recall, and I can't hold a gun: everyone looks like a threat. Defendants' conduct was so far below the standard set by Title IX, Professional Rules of Conduct, contract, tort, and civil rights laws, that it destroyed any future good will in associating with the school; I could not attend my law school graduation, and the benefit of my law degree is irrevocably impaired. My intimate, personal, and professional relationships, as well as my ability to study, work, and prepare for the bar exam are impaired by defendants' conduct: I fear people in suits, in schools, and jobs, because a law school should be a safe environment, and if injured, aid should be timely, appropriate, and competently administered.

**V. Relief:** WHEREFORE, plaintiff demands damages of five million ($5,000,000), which includes paid tuition ($238, 038), interest and attendance fees; lost wages  beginning April 2015 ($47,242/year); Title IX and 42 USC § 1983 damages, state law damages: violations of tort, contract and GBL § 349 (alternatively, conjunctively, and individually), pain and suffering, punitive damages, and incidental damages against the defendants, joint and severally, for their nonfeasance and malfeasance as agents and employees of New York Law School; and against defendants individually for state law violations, and civil rights violations committed by Archer. Additionally, I ask the court to search the record and grant plaintiff summary judgment as a matter of law on legal claims fully established , together with any other relief that the Court finds to be just and proper.

**I declare under penalty of perjury that the foregoing is true and correct.**

July 5, 2016

Theresa Bailey
1809 7th Avenue, Apt. No. 4D
New York, NY 10026
(917) 484-0865

## __EXHIBITS__

A. NYLS Harassment and Discrimination Review Board's Report

B. Email: Request from Harassment and Discrimination Review Board

C. April 2015 Letter to Anthony Crowell

D. Email: Request from me for advice from NYLS professors

E. Letter to POTUS

F. Letter to Legal Grievance Committee

G. Office of Civil Rights Response

H. Marine Corps Active Duty Recall Letter

I. Daily News Article: I am Sherry Bailey's child born Dec 20, 1984.

# EXHIBIT

# A

Confidential work product of the Harassment & Discrimination Review Board

DRAFT

### Introduction

On October 10, 2014, pursuant to Section II.D of the New York Law School's ("NYLS") Non-Discrimination and Harassment Policy (the "Policy"), Howard Meyers, the Chair of the Harassment and Discrimination Review Board (HDRB) convened an Investigation Panel (Panel) to investigate two complaints of harassment against student Stephen Nesbit: (1) one brought by the NYLS Administration, and detailed in an Incident Report dated October 6, 2014;  and (2) a second brought by a student, Theresa Bailey, and detailed in a formal written complaint dated October 26, 2014.  The Panel consisted of Jeff Becherer, Assistant Dean for Career Planning, and Erika Wood, Associate Professor of Law.  After a thorough investigation of the complaints and an additional incident concerning Mr. Nesbit, and based on the findings of fact described below, the Panel finds that Mr. Nesbit violated Section I.B.2 of the Policy which prohibits "subjecting an individual to humiliating, offensive, abusive or threatening conduct that creates an intimidating, hostile or abusive work, residential or academic environment, . . . or unreasonably interferes with an individual's academic . . . performance on the basis of the individual's Protected Classification."

### Findings of Fact

The following are the findings of fact regarding allegations of harassment in violation of Section I(B)2 of the Policy.

### Incident #1

Based upon an Incident Report (attached hereto as "Exhibit A") prepared by Security Officer Halbert Pacheco, including statements made to Officer Pacheco by two female students:

I.     On August 28, 2014, between approximately 3:00 – 3:30 PM, Stephen Nesbit approached two female students, independently, on the fifth floor balcony.

II.    Mr. Nesbit was inebriated.

III.   Mr. Nesbit approached the first female student on the West Broadway side of the balcony, began flirting with her and spoke about being her friend.  Once Mr. Nesbit left, that student called security and reported the incident.

IV.    Mr. Nesbit approached the second female student while she was sitting on the Leonard Street side of the balcony.  Mr. Nesbit sat down near this student began speaking with her, telling her that he is her friend and that he can help her.  This student told Mr. Nesbit to leave her alone.

V.     Officers Pacheco, Greer and Calvin observed Mr. Nesbit speaking with the second female student.  They also observed that he appeared drunk and smelled like alcohol.

VI.    Mr. Nesbit was escorted out of NYLS through the 47 Worth Street building.

VII.   Mr. Nesbit admitted during his meeting with the Investigation Panel that he was intoxicated on campus on August 28, 2014.

Confidential work product of the Harassment & Discrimination Review Board

DRAFT

Incident #2

Based upon a Security Incident Email drafted by Officer Karl Alini (attached hereto as "Exhibit B"); a formal written complaint dated October 26, 2014 submitted by Complainant Theresa Bailey (attached hereto as "Exhibit C"); review of security camera footage; interviews with Theresa Bailey, Stephen Nesbit and Paul Metcalf; and conversations with Assistant Dean for Academic Affairs Vicki Eastus, Assistant Dean for Student Engagement Helena Prigal, and Director of Student Engagement Sally Harding:

I. On October 6, 2014, between 6:30 and 7:00 PM, Theresa Bailey left her Constitutional Law class in W300 on the third floor of the West Broadway building to use the restroom on the third floor of the West Broadway building.  Upon doing so, she left the restroom and walked toward the elevators along the left side of the hallway.

II. Ms. Bailey then encountered a student whom she knew only as a fellow student.  The student was Stephen Nesbit.  Mr. Nesbit is approximately 6'2" and 200 pounds.  Mr. Nesbit was wearing black gym shorts, a baseball hat, a windbreaker, and a backpack.

III. Mr. Nesbit was walking towards Ms. Bailey in the direction of the restroom.

IV. Mr. Nesbit then veered across the hallway, bumped into Ms. Bailey in a deliberate manner, causing Ms. Bailey to be pushed up against the wall.  Mr. Nesbit kept walking.

V. After Mr. Nesbit passed, Ms. Bailey turned around, with the intent to confront him.  She then saw that Mr. Nesbit's shorts were pulled down in back, exposing his buttocks and upper thighs.

VI. Ms. Bailey then turned back around and continued walking away from the restroom towards the elevator looking for a phone to call security.

VII. Ms. Bailey turned around again to verify that Mr. Nesbit had continued walking into the restroom, only to find that Mr. Nesbit had stopped, turned around, and was facing her.

VIII. Ms. Bailey observed that Mr. Nesbit's eyes were red and glazed over, he was breathing heavily and drooling, and his arms were away from his body with his hands balled up in fists.

IX. Mr. Nesbit began walking toward her.

X. Ms. Bailey felt terrified and panicked.  She thought about running, but feared slipping or falling in the hallway due to wearing high heels.  Security camera footage from October 6, 2014 at 6:57 p.m. shows Ms. Bailey trying to run towards the elevators and then stopping suddenly and turning back towards the hallway.

XI. Ms. Bailey began walking quickly away from Mr. Nesbit, and encountered Mr. Metcalf as she walked past the staircase on the third floor.  She asked Mr. Metcalf if he was a student or professor, to which he responded "student".  Mr. Metcalf asked her if something was wrong. She did not respond.

XII. At this point, Ms. Bailey turned around again and noticed that Mr. Nesbit looked composed, leaning up against the wall near the stairwell.

Confidential work product of the Harassment & Discrimination Review Board

DRAFT

XIII.     Mr. Metcalf continued walking toward the restroom and Ms. Bailey followed him, grabbing him just before he entered the restroom, and telling him what had just occurred, including that Mr. Nesbit had exposed his buttocks.

XIV.     Mr. Metcalf walked Ms. Bailey back to her class in W300.

XV.     Mr. Nesbit does not deny any of these allegations.  He described being under the influence of prescription medication on October 6 and stated that he has no memory of being in school that evening.  He stated that his last memory on October 6 is leaving the Canal Street subway station at approximately 3:30 pm.

XVI.     During two interviews with the Panel, on October 20 and November 5, Ms. Bailey described feeling scared, unsafe, and vulnerable on campus as a result of this incident.


Incident #3

Based upon an Incident Report prepared by Security Guard Karl Alini (attached hereto as "Exhibit D"); interviews with students Female Student #1, Stephen Nesbit, and Paul Metcalf; and conversations with Assistant Dean for Academic Affairs Vicki Eastus, Assistant Dean for Student Engagement Helena Prigal, and Director of Student Engagement Sally Harding:

I.     On October 6, 2014, at approximately 7:00PM, Female Student #1 was walking down the stairwell from the fifth floor to the third floor of the West Broadway building.

II.     Female Student #1 observed Stephen Nesbit sitting on the bottom stair of the stairway on the third floor, talking to himself. Mr. Nesbit was wearing black gym shorts, a baseball hat, a windbreaker, and a backpack.

III.     As Female Student #1 walked past Mr. Nesbit on the stairs he looked up and made eye contact with her.  No words were exchanged, but Female Student #1 described Mr. Nesbit as looking upset and angry.  Mr. Nesbit remained seated but stared at Female Student #1 as she passed and walked into the hallway.

IV.     Female Student #1 then turned to walk in the direction of Leonard Street.  She saw in the reflection in the windows that Mr. Nesbit was now following her.

V.     Female Student #1 turned left at the end of the hallway (toward West Broadway) in the direction of the classrooms along the Leonard street side of the building.  She sat down on a couch outside classroom W301.

VI.     Mr. Nesbit sat down on the couch opposite Female Student #1.  He stared at her with bloodshot eyes for about one minute and seemed to be trying to get her attention.  He tried to put his hands in his jacket pockets, but fumbled and was unable to.

VII.     Female Student #1 did not know Mr. Nesbit and was made uncomfortable by his stares.  Mr. Nesbit did not say anything to Female Student #1.  Female Student #1 described getting very scared when Mr. Nesbit tried to put his hands in his pockets.  She was concerned that he might do something violent to her or others.

VIII.     Female Student #1 then got up and walked to the stairwell along West Broadway and then downstairs to the security desk.

Confidential work product of the Harassment & Discrimination Review Board

DRAFT

IX.   Female Student #1 reported the incident to the security desk.  Female Student #1 was very scared, her hands trembled and she had trouble finding words while speaking with security.

X.    After reporting the incident to security, Female Student #1 walked to the restroom on the first floor of 185 West Broadway so that Mr. Nesbit would not see her when he left the building.

XI.   After Female Student #1 got up, Paul Metcalf came upon Mr. Nesbit sitting on the couch outside of W301.  He asked Mr. Nesbit "are you okay?" to which Mr. Nesbit responded "I'm just sitting here scratching my balls."  Mr. Metcalf replied "I didn't ask you what you were doing.  I asked if you were okay?"  Mr. Nesbit responded that he way okay.

XII.  Mr. Nesbit does not deny any of these allegations.  He described being under the influence of prescription medication on October 6 and stated that he has no memory of being in school that evening.  He stated that his last memory on October 6 is leaving the Canal Street subway station at approximately 3:30 pm.

XIII. As of Monday, October 20th, Female Student #1 remained upset about the incident and reported that it made her feel unsafe.  She never expected to encounter this behavior at NYLS.

Given the Findings of Fact above, the Harassment and Discrimination Review Board Investigation Panel determines that Mr. Nesbit violated Section I(B)2 of the Policy.

### Investigation Panel Recommended Sanctions

Given the violation of the Policy, the Investigation Panel recommends the following sanctions:

I.    Mr. Nesbit shall not be permitted on campus from now through January 11, 2015.  Mr. Nesbit will coordinate with the Office of Academic Affairs to complete his coursework and exams for the Fall 2014 semester.

II.   Mr. Nesbit shall be placed on probation through his graduation from NYLS.  The terms of the probation shall include:

   a.  Any additional violations of the Policy shall result in immediate expulsion;

   b.  Mr. Nesbit's physical presence on campus, beginning on January 12, 2015, be limited to attending class or any co-curricular activity and NYLS's Jumpstart Program.

III.  Mr. Nesbit shall enroll in classes which meet between 9:00AM and 5:40PM.  In the event that a course which Mr. Nesbit is required to take is not offered during these hours, the Assistant Dean for Academic Affairs will assist Mr. Nesbit in resolving the situation.

IV.   Mr. Nesbit shall not enroll in any courses for which Ms. Bailey or Female Student #1 is enrolled.

V.    Mr. Nesbit shall have his schedule approved by the Assistant Dean for Academic Affairs.

VI.   Mr. Nesbit shall attend a harassment training program as determined by the NYLS Title IX coordinator.

Confidential work product of the Harassment & Discrimination Review Board

DRAFT

VII.     Upon graduation from NYLS through commencement of the July 2015 NY Bar Examination, Mr. Nesbit shall only appear on campus to attend a Bar Review course.  Mr. Nesbit's additional studies for the July 2015 Bar Examination shall take place off campus.

VIII.    After conclusion of the July 2015 NY Bar Examination, Mr. Nesbit shall not appear on campus for any reason until Ms. Bailey has graduated from NYLS and completed her bar preparation and examination.

Confidential work product of the Harassment & Discrimination Review Board

DRAFT

I hereby adopt the findings and recommendations of the Investigation Panel

_____

Howard S. Meyers

Chair, Harassment & Discrimination Review Board

# EXHIBIT

# B

# Re: Request from the Harassment and Discrimination Review Board

### Bailey, Theresa

Tue 4/7/2015 2:35 PM

To: Meyers, Howard <Howard.Meyers@nyls.edu>;

Cc: Blecker, Robert <Robert.Blecker@nyls.edu>;

Importance: High

Dear Mr. Meyers,

Thank you for your email. It gave me a different perspective on this situation, and I thought I'd share that perspective with you (and the Harassment and Discrimination Review Board) rather than my social media audience.

Yesterday, I received an "important" email from you on behalf of the Harassment and Discrimination Review Board. Yesterday, was ten days after we sat for a hearing, so I wasn't alarmed that the Harassment and Discrimination Review Board had "important" information to share. After all, ten days had passed and I waited a long time for a hearing.

Your email didn't contain the decision from the Harassment and Discrimination Review Board nor any indication when I should expect your decision. Your email, marked with a little red exclamation point, which gave me pause, and for a moment hope, was to request that I remove a posting from social media.

You and I clearly have different views on what is important. But, since the little red exclamation point worked so well for you, I thought I'd give it a try.

Despite the insensitivity, I replied to your email. I do not agree that my post violated the confidentiality of the hearing, but I will remove the post. I understand my post is inconvenient for New York Law School and Mr. Nesbit, and I do not want my failure to comply to become an excuse for the delayed decision.

If you're hoping I'd get to point, please bear with me a while longer. During the March 26 hearing, Professor Schoenbrod said he wasn't aware that the initial incident occurred approximately six months ago. So, it's necessary for me to share these details, so that we are operating from the same information.

Below is a brief summary of events from my perspective, and hopefully will help you understand my later request.

§ My incident occurred in New York Law School on Oct 6, 2014
§ I reported the incident to New York Law School Oct 7, 2014
§ In response to my concerns of safety, I was told Stephen Nesbit was no longer on campus
§ Two weeks later, I was informed Stephen Nesbit was back on the NYLS Campus

§  I reported the incident to the police the same day I learned Stephen Nesbit was returning to campus

§  I was told by the police too much time has passed and I should see a lawyer

§  I wrote a letter to both Deans Crowell and Archer – this letter was used as my "complaint"

§  I spoke with two different attorneys – our interests weren't aligned (they had a different defendant in mind)

§  Dean Archer replied and we had an in-person meeting

§  Dean Crowell never replied nor did he attend the meeting (I thought of stopping him in the halls, but I didn't think someone who avoided the matter would be helpful, so I continued with a process that was doing more harm than good to me)

§  There was an investigation and recommendations were made

§  I did not agree with the recommended sanctions and moved for a hearing

§  A week before the hearing, the same day as the NYLS faculty meeting, Stephen was dancing in the halls and carrying on at the security desk

§  I checked my email for notice that the sanctions that I had protested were too light, were lifted (I didn't see any such notice)

§  After 10 minutes of watching Stephen carry on, I went to see Dean Eastus, and learned she was in a faculty meeting

§  I went to see Dean Hope. He said he hadn't heard anything about a change in the sanctions

§  March 19, Stephen Nesbit failed appear and the hearing was rescheduled

§  March 26, the hearing took place

§  April 6, I received your "important" email

§  Today, April 7, I am making a plea to the Harassment and Discrimination Review Board

I am a New York Law student. I am an evening student, and expect to graduate in the spring of 2016. When I began at New York Law School, I was employed full-time at Teach For America, and completing my service commitment to the Marines. Late 2013, I was released from obligated service with the Marines, and four days ago I gave my two weeks notice to my employer. I don't have a job lined up, a trust fund, nor any significant savings, but I trust that I've learned some marketable skill from the years that I've been attending New York Law School. I put off starting a family of my own until I complete my J.D. and MBA, but I am very close to the maternal side of my family. My grades aren't the best, but I'm an honest student – I do not make excuses or request accommodations for struggles that so many NYLS members endure.

I won't describe every hardship I've suffered to justify my short comings - like Mr. Nesbit, because I'm aware that others too have  suffered, and some of them are suffering more than I am. I don't think it's right to measure divulged pain or the fact that some of us choose not to or aren't ready to disclose personal hardship in deciding whether an action is punishable and by how much. Since Mr. Nesbit has taken the route of using past experiences to mitigate his actions, I will say that Mr. Nesbit is out of touch with reality to think his suffering is great. What gets me through my hardest days and gives me hope is perspective. There are people around me that are enduring so much pain, and since they're smiling, so the least I can do is give my best effort to every task I am given.

December 2013 I began running, to cope with all of the stress in my life. It reminds me that I'm strong and can endure. October 2014 would have been a new beginning for me. I was going to run my first marathon in Chicago, in three hours and thirty minutes, and return to New York and complete the New York City Marathon in the same time. I trained for months. This wasn't so much about running as it was about starting over. Then Stephen Nesbit happened – a week before the Chicago marathon. Here I am again, trying to start over again.

3/14/2016
RE: Request from the Harassment and Discrimination Review... - Bailey, Theresa
Case 1:16-cv-04283-ER   Document 17   Filed 07/05/16   Page 16 of 45

I have felt estranged from this school throughout this process.

Here are a few things I would have appreciated during this process, particularly since my goal in attending this school is to become a competent legal professional:

§ Early advice on possible legal remedies against Mr. Nesbit, or at least a warning that if I wanted to preserve my legal options I should seek an outside attorney sooner rather than later
§ Clear communication. Particularly in regards to Mr. Nesbit being removed from campus
§ Early advisement and insistence on getting an advisor early on to help me through this process. I wasn't thinking clearly after the October 6 event, and the number of times I spoke to NYLS faculty about my concerns – sometimes while my classes were in session, was a clear indication that I needed more help and guidance than I was being offered. I can't stress how this would have changed things for me. It didn't feel good to have to be told by police officers and outside attorneys the conflicts between me getting a resolution and the school's interest
§ A response from the Dean of the law school, or at least a mention of why he didn't respond would have been appropriate

Please note that I'm not trying to be cute by sending this email just before 5:00pm. I have been writing this for most of my day at work– this situation literally destroys me afresh each time I have to think about it.

In light of the length of time I have already waited for a reply, I am respectfully requesting a response from the Harassment and Discrimination Review Board by 5:00pm, Thursday, April 9.

Respectfully,

Theresa

Theresa
J.D. Candidate, Expected 2016
http://www.linkedin.com/in/theresabailey

---

**From:** Meyers, Howard <Howard.Meyers@nyls.edu>
**Sent:** Monday, April 6, 2015 11:27 AM
**To:** Bailey, Theresa
**Cc:** Blecker, Robert
**Subject:** RE: Request from the Harassment and Discrimination Review Board

Dear Ms. Bailey:

On March 20 you posted on social media that Mr. Nesbit "was scheduled to appear at a hearing; he did not show" . . . "and he will not be penalized for failing to appear at yesterday's hearing."

Sincerely,

Prof. Meyers

---

**From:** Bailey, Theresa [mailto:theresa.bailey@law.nyls.edu]
**Sent:** Monday, April 06, 2015 12:16 PM

**To:** Meyers, Howard
**Cc:** Blecker, Robert
**Subject:** Re: Request from the Harassment and Discrimination Review Board

Good morning Mr. Meyers,

I do not believe that I have violated the confidentiality of the hearing. Please specify exactly what portion of my post violated the confidentiality of the hearing. I do not believe that my commentary on how I feel about this process and the impact it has on my personal and professional life violates the confidentiality of this process.

Best,

Theresa
J.D. Candidate, Expected 2016
http://www.linkedin.com/in/theresabailey

---

**From:** Meyers, Howard <Howard.Meyers@nyls.edu>
**Sent:** Monday, April 6, 2015 9:52 AM
**To:** Bailey, Theresa
**Cc:** Blecker, Robert
**Subject:** Request from the Harassment and Discrimination Review Board

Dear Ms. Bailey,

It has come to our attention that, following the hearing on March 19, you posted commentary about the Harassment and Discrimination Review Board hearing on social media. We remind you that the hearing proceedings are confidential, as you were reminded by Mr. Lewis at the beginning of each hearing day, and as each witness was told before they began their appearance.
We ask that you remove any postings about the hearing that you have made, and that you refrain from violating the confidentiality of the hearing process.

Please let me know if you have any questions about this, and please inform me by 5:00 tomorrow (Tuesday, April 7) if you have removed any and all commentary about the confidential proceedings from social media and/or any other source.

Thank you,

Prof. Howard Meyers
Chair, Harassment and Discrimination Review Board

# EXHIBIT

# C

Dear Dean Crowell,

Early Spring of 2012, I accepted a position at Teach For America. They accepted me with full knowledge that I had applied for law school that Fall, and it was uncertain whether I would remain with the company.

I resolved that I would only go to law school in the Fall, if I was accepted to the law schools of Columbia or New York University. It never occurred to me that I wouldn't get in, but, if by some fluke, the universe went crazy and I wasn't accepted, I would remain at Teach For America and reapply.

Later that Spring, I received a letter from New York Law School. It was an acceptance letter. I emailed my manager at Teach For America, who had become a close friend, despite our short time working together.

Here was a chance for me to continue doing work that had become important to me, while earning my JD. I was excited. Some thought my decision was risky, but their opinions didn't matter to me. The two main reasons for my decision were that I could support my family financially while going to school, and I intended to get an MBA later, so I could attend Columbia or NYU at that point.

Upon entering New York Law School, I was greeted by a deafening sense of lethargy and entitlement. I had prepared for cut throat and unapologetic drive; I had prepared for unyielding competition; I had prepared for passionate debates on push button topics, late nights working on assignment, and dark circles under tired eyes, but I hadn't prepared for this.

Peers, who would eventually become my colleagues, spent entire classes and semesters, catching up on their favorite television programs, sporting events, wedding planning, and managing their finance portfolios – during class. My expectation of being challenged and stimulated by the unrelenting will of my peers died, and was replaced with the acceptance that by learning the art of excuses and brown nosing, anyone could be successful at New York Law School.

My life hasn't been easy, but I do not count pursuing a JD as an evening student among its challenges. Regardless of what my peers were doing, the art of schmoozing couldn't save me from the real world issues I was facing. The only way to change my circumstances is to change the way I respond to challenges, so I fought to get more from the law lectures and textbooks; I realize the importance of a solid legal education.

October 6, 2014, I left Constitutional Law to use the restroom. I encountered a male student that entered NYLS in 2012; a male student that I had observed and intentionally avoided. His actions towards women embodied entitlement and ownership: always too close, making physical contact without permission, interrupting their lives to make space for his agenda, staring for long periods, and ogling our bodies – he was the Joe Biden of New York Law School, but with less charm and the added ingredient of hostility. Joe Biden takes for granted that his presence and touch is always welcomed; Stephen Nesbit has not earned any position or title warranting him drawing this same conclusion. This is the person that I was alone with in the halls of NYLS that evening.

Dean Crowell, you know what happened next, as you've read the letters addressed to you and other NYLS staff.

*1*

When I brought this incident to the attention of New York Law School, my intent was – and still is - to secure a safe place for me to study. Yes, I was upset that a person I had observed disrespect women on numerous occasions was admitted to and permitted to stay at the same law school as me, and yes, I am upset that I had waited for campus security to show up and they hadn't - not during the incident nor immediately after. In fact, campus security never showed up. Mostly, I was ashamed. Stephen Nesbit got close to me because my guard was down. I am a Marine; I have been trained. My body and mind has been hardened from the pain that comes when you make mistakes and are unprepared. That is how Marines are made: through pain comes discipline, and when the body has endured enough pain you are reborn a Marine.

The best Marines act without thinking. They are fearless, because they haven't processed what they're told to do. There lies my problem: I think first. In the Marine Corps there is an acceptable casualty rate, not just on the battle field, but in training as well. Most of the Marines I trained with joined straight after of high school, but I joined after I earned my four year degree. I was deeply affected by the tolerance of senseless loss, and I felt accountable for the young impressionable lives around me. So, I made it my mission to protect the Marines under my care, and to raise awareness of the cost of being the elite fighting force. Somehow, I have become an acceptable casualty of this incident at New York Law School.

I haven't deployed to a combat zone or been diagnosed with any mental disorder.  I didn't imagine that I was in danger the night of October 6, 2014, at New York Law School. Stephen Nesbit posed a serious threat to my body, and my only question was whether I was in danger of being sexually violated as well.

After the event, I had panic attacks in the halls; numerous times I had to leave class so that I wouldn't fall apart while remembering that I was in the same building where I had been brazenly preyed upon by Stephen Nesbit. Before the incident, New York Law School was my safe haven, but that was the past. No longer could I disappear into the lectures and course work, because the very people and actions I entered law school seeking to quell were seated beside me.

Several times I spoke with NYLS staff about my concerns. One suggestion was that security patrol more often when I have class - the same security that failed to save me the night of October 6, 2014. My first semester, I noted in an NYLS survey, that I was speaking with a female student when a  security guard stopped in his tracks and turned 180 degrees to look at a third female student walking down the hall. We were stunned. There were only four people in the hall that night. From that point, I did not interact with security, and I made sure never to be at the law school late at night. My safety anxiety, caused by the October 6 event, lessened when I was told Stephen was no longer on campus.

October 20, 2014 I learned Stephen was coming back to campus. In addition to asking help from the police, I appealed to NYLS students, and they did not disappoint. Before I named my attacker, they told me who he was, and then unburdened themselves of their encounters with Stephen Nesbit. But no one would come forward. I heard every excuse from fears of not receiving ongoing financial support from the school to fears that their coming forward would drag a fellow student in that did not want to be involved. I wasn't surprised. My peers may have received better grades, but they are best suited for the academic environment. From 2012, I knew the majority of these students did not have the integrity, courage, discipline and determination to take action when required.

What happened to me in the halls of NYLS was tragic, but something I could overcome. New York Law School's response is what truly devastated me.

During this process, New York Law School's process, I was intentionally mislead by NYLS staff to the detriment of my getting justice against Stephen Nesbit.

I was told Stephen was removed from campus. Period. This is why I didn't go to the police until October 20 – the day I was told Stephen was back on campus. I was told there was no pattern of misconduct, when, in fact, there were several incidents that had been well documented by the school. I was assured that Stephen was a "good" person, and it was suggested that I ask about Stephen's character. So, I asked about Stephen's character. Several students witnessed Stephen being escorted from school by security on a separate occasion and were surprised that he had been allowed back on school grounds. I reached out to alumni, and they instructed me to reach out to you, the Dean.

Now that I am fully aware of the circumstances, I know that New York Law School, as an institution, lacks moral judgment, integrity, courage, and justice, so I can't expect these values of its students. I have paid handsomely to be told that I am nothing by New York Law School rendering a decision in favor of a white male that attacked me within its walls. Stephen Nesbit lied to the mental health professional whose job was to assess whether he should be permitted back on campus and NYLS staff are aware of this deceit. Stephen reported that there were no other incidents at New York Law School and that there was no history of alcohol abuse. The report concluded that based on the information provided by Stephen, he was not a threat to himself or others. Yet, New York Law School allowed Stephen to return to campus.

I was neat, patient, respectful, and complied with every order, and because of this, New York Law School thought it was appropriate to take more than six months to render a final decision. This decision – in the face of what the school knows of Stephen Nesbit – is the school's ultimate admission of its failure as a law school.

Their decision reminds me that I am colored, I am a female, and I am a veteran. When I am hurt, it means less; when my blood is shed, it is an acceptable loss; when I cry, it is expected; when I ask for help, I am undeserving; when I speak, I can be ignored; when I write, my words can go unremarked; because I am a female, I have a place; because I am colored I am less.

I am also reminded that despite my military training or that I was raised by a Marine, I am not without fear. I am afraid of becoming a legal professional that comfortably sits behind a desk reading accounts of violations taking place within feet of their door, but unwilling to act. I am afraid to gain a degree and lose my humanity; I am afraid for other women Stephen will encounter; I am afraid to continue to stay silent on this matter, because that would substantiate everything that New York Law School's decision has already said about me, and that would be an act of violence against myself.  I am afraid that other female veterans of color will hear the same message, but they'll internalize it, so they'll be less of us fighting for us.

In light of the school's decision, I am seeking to transfer law schools.  One year before I am expected to graduate, I am willing to have my graduation date pushed back, lose credits, and incur additional education expenses, because I am more than what New York Law School's decision has rendered me. I am thankful for the good experiences I have had, and the good people I have met here, however, they are too few and too far in between. I have reached out to the individuals who have inspired and grown me, and whose integrity and moral compass is still intact, and have enlisted their help in whatever

capacity they see fit to help me move on. I hope to benefit from their collective knowledge and experience in navigating a transfer this close to graduation.

When Spring 2015 exams are done, I will knock on the doors of nine top tier law schools and twelve back up schools for admittance this Fall. At this point, I can honestly say that I have exhausted every remedy available to me through New York Law School, so I am seeking to graduate from a different law school.

I am a New Yorker, I am a veteran, I am a woman of color, and I cannot graduate from the same law school as my attacker – that would destroy me.

I hope that my candidness about my experience at New York Law School will be taken with an open mind, and with the understanding that drafting this letter and requesting assistance with moving to another law school, particularly under these circumstances, is difficult for me. I have no malice towards any member of NYLS staff, however, I am disappointed in and have lost trust in the individuals who knowingly hindered justice in this instance.

I thank you for your time, and would welcome your help should you decide to support my endeavor.

Sincerely,

Theresa Bailey

4

# EXHIBIT

# D

# Re: Advice for a 3LE Student Transferring Law Schools

Sat 4/25/2015 12:47 PM

To:Blecker, Robert <Robert.Blecker@nyls.edu>; Strossen, Nadine <Nadine.Strossen@nyls.edu>; Warshawsky, Daniel <Daniel.Warshawsky@nyls.edu>; Kostant, Peter <Peter.Kostant@nyls.edu>; Haas, Jeffrey J. <Jeffrey.Haas@nyls.edu>; Elvy, Stacy-Ann <Stacy-Ann.Elvy@nyls.edu>; LaPiana, William P. <William.LaPiana@nyls.edu>; Goldstein, Brandt <Brandt.Goldstein@nyls.edu>; Hogan, Mariana <Mariana.Hogan@nyls.edu>; Chang, David <David.Chang@nyls.edu>;

Cc:Eastus, Victoria L. <Victoria.Eastus@nyls.edu>; Meyers, Howard <Howard.Meyers@nyls.edu>;

Good afternoon Professors,

My name is Theresa Bailey. I am a 3L evening student, and I am truly honored to have studied under your direction or to have otherwise been positively impacted by you during my time at New York Law School.

I am reaching out to you to express my gratitude for your contribution towards my legal education, and that I might benefit from your years of experience once again.

On October 6, 2014, I was attacked by a male student, outside the restrooms on the third floor of the W building. April 9, 2015, I received New York Law School's final decision on the matter. In light of New York Law School's decision, I am seeking to transfer law schools. I have fully explained my reasoning in the redacted letter to Dean Crowell attached.

Dean Eastus and Professor Meyers were present throughout, and can tell you that I have complied with the school's process and have exhausted remedies available to me through New York Law School.

As it stands, when I transfer, I will lose credits, my graduation will be delayed, and I will incur additional education expenses. However, my personal constitution requires me to do so.

I am hoping that you have encountered this unusual situation - a 2L/3LE transfer, and can help me navigate this process so that I won't lose unnecessary time. My goals is to effect a transfer in time for the Fall 2015 semester.

Thank you again for your contribution to my professional development, and I welcome any future help you may be willing to provide.

Sincerely,

Theresa
J.D. Candidate, Expected 2016
http://www.linkedin.com/in/theresabailey

# EXHIBIT

# E

Dear Mr. President:

My name is Theresa Giovanna Bailey. October 2014 I was attacked by a male student on New York Law School's campus during class hours. Admittedly, I have fallen into depression after my attacker was permitted to graduate from New York Law School, but I pray daily for strength, and I am being the best advocate for myself that I can be at the moment. Part of my effort has led me to write to you.

I thank you for your service as Commander in Chief. Before you took office, I was a stark republican. I followed your campaign, and I no longer care whether a nominee was republican or democrat; I care only that a nominee is for the people, and that is why I voted for you. Below is an assignment that I turned in for my Legislative Drafting course this past February, summarizing my attack and one of the ways that New York Law School has obstructed justice of my attacker.

In an age where school violence, and particularly violence against women on campus, is common knowledge, I hope that our laws will focus more on preventing *any* assault against women on school grounds rather than to provide a remedy once a violent sexual assault has occurred.

In continued efforts to provide safe schools for myself and other women, I plan to report the Dean of New York Law School to the bar association for breaching several duties that I am owed. Also, I will reach out to the White House Task Force to Protect Students from Sexual Assault and offer my pro bono hours to assist in any way their efforts.

As my peers prepare to graduate from law school this May, absent some miracle, I will not attend my graduation at New York Law School. Instead, I will stand in solidarity with women that have been victimized on college grounds, but have not seen their attackers face justice, by releasing my admissions statement to Columbia Law School via YouTube. My statement was never read by Columbia Law because my application lacked a second letter of recommendation from a New York Law School professor, and was therefore incomplete.

Had I known I wouldn't receive the LOR from a New York Law School professor, I would have emailed law school professors, women's and diversity groups at every law school and asked for their support. That is how much I value my education.

Not knowing whether I'd ever get the LOR from New York Law School, and faced with either returning to a school where I'd been mistreated or not attaining a law degree, I agreed to be reinstated to the school in September 2015.

January 2016, I learned that I was failed in one course and received a D+ in another course for the previous semester. It is too convenient and cute that I had my worst semester after I used social media to bring awareness to what happened to me at the school. I have requested a review of the grades, and am awaiting an update from New York Law School.

Mr. President, please keep me in your prayers, and think of my story as you pass laws to combat on campus violence against women.

Respectfully,
Theresa Bailey

Theresa.bailey@law.nyls.edu
1809 Adam Clayton Powell Jr. Blvd. Apt. 4D
New York, NY 10026

The Honorable Grace Meng
Member, United States House of Representatives
32-26 Union Street, Suite 1B
Flushing, NY 11361

Re: an act to combat assault on women on higher education campuses

Dear Congresswoman Meng:

I am a woman of color, marathon runner, Marine veteran, U.S. citizen, feminist, law student, and
voter. I believe in women's rights, civil rights, human rights, education, diversity, equality, and
justice. October 6, 2014, I was attacked in the hallway of New York Law School by a white male
student. May 2015 Stephen Nesbit graduated from New York Law School.

I ask for your support to sponsor a bill to combat violent assaults on women on higher education
campuses, because I personally have experienced the effect of being assaulted while pursuing a
graduate degree. Being assaulted on my school campus was demoralizing, but the lengths that New
York Law School has undergone to insulate my attacker from justice has destroyed me. I ask for
your support because my story is not unique: a woman who is assaulted on a higher education
campus, and reports it to that institution, is several times less likely to get redress.

I applaud the *White House Task Force to Protect Students from Sexual Assault* for recognizing that
women are overwhelmingly the victims of sexual assault. However, my incident falls outside the
scope addressed by the task force detailed on *notalone.gov*. I'd like to propose this bill to the task
force to see if a joint effort is possible. A systematized and uniform approach for *any* assault against
women at higher education institutions would drastically reduce sexual and violent attacks. This
legislation will require higher education institutions that receive government funds to take the
affirmative action outlined in this bill to give victims timely and adequate redress. A systemized and
uniform body of rules gives notice to parties of the protocol and penalty, and increases accessibility
and fairness.

In 2013, I wrote your office about the dangerous conditions and misconduct of superior officers at
6th Communication Battalion, the Marine base where I was stationed. Your inquiry led to a swift
and thorough investigation, and ultimately a judgment in my favor. Prior to writing you, I asked
New York Law School for help, and they referred me to Legal Aid. Since 2013 I have followed
your endeavors, and you have my sincere thanks for your service in the United States Congress. I
am pleased that you were reelected, and I admire the way you responded to being attacked by a
mugger in 2013. Your contribution to *the Task Force on Economic Development*, and various
commitments to diversity inclusion and gun violence prevention initiatives give me added assurance
that your support is needed to introduce this bill.

October 6, 2014, I left my class to use the restroom. Stephen was in the hall. At that time, I knew
him only as a student that entered the school in my year. On campus, I had observed him around
women, aggressive, making physical contact without permission, and invading personal boundaries.

He trapped me, so that I could not pass, and then used his six-foot tall, two-hundred pound body to
push me at one-hundred, twenty-five pounds into the wall. As he slid his body across mine, images

of Columbine, Virginia Tech, and the Virginia Appalachian Law School shootings came to mind. I have been victimized, but I am not a victim; I am small, but I am not helpless. The man that attacked me had nothing to lose, and I feared I would die in that hall. I freed myself and quickly turned to confront him, my instinct is to fight. His back was towards me, and his butt and thighs were exposed.  Pressed against the wall, I didn't know Stephen's pants were down. I realized I had to run, but before I could act, Stephen turned and faced me.

His eyes were red and glazed over, he was drooling, his chest was rising and falling, he was clenching and unclenching his fists, and his shoulders were rounded in an aggressive posture. He came towards me, focused and enraged.

I had on high heels, stockings, and a dress. I could only run back to class if I could get my stockings and heels off, but I didn't have time. I got to the stairwell, and saw a middle-aged man. I ran to him, and turned to point to a deranged Stephen. However, in the presence of this man, Stephen was perfectly composed.

I was unable to speak: my attacker who moments before was like a rabid animal now appeared to be a model student. Stephen wasn't deranged or on bath salts as I thought, his actions were calculated. The middle-aged man continued towards the restroom. I recovered and begged him not to leave me in the hall. He led me to my classroom, and went to tell security. I reported the incident to Dean Hope, and later to Deans Archer and Crowell. I asked that Stephen be expelled.

I was attacked in front of a camera. I asked if the cameras worked, what was security's response time, the protocol for violent attacks, and if Stephen had been reported for similar acts. In response, the school said Stephen was no longer on campus, and there was no prior knowledge of any incidents. I began having panic attacks in class, so I would leave mid class and talk to a dean about my safety concerns. I didn't feel safe and I was not satisfied by the way my questions were dismissed. I was comforted knowing that a law degree would mean I could prevent this from happening to other women. I got a call two weeks later from the school: Stephen was back on campus.

I was leaving work and headed to class when I got the call. I called every lawyer I knew, and was told to go to the police and make a report. The police spent more than two hours helping me find the identity of the NYLS student who attacked me. Unfortunately, since I reported Stephen two weeks after the attack, they couldn't arrest or issue a temporary restraining order against him, because he wasn't an imminent and immediate threat to me by law.

This was my rude awakening: sophisticated, competent people don't wait two weeks to file a police report, if they're in danger. I would have to go before a judge and explain the delay in reporting the attack and demonstrate that Stephen presently posed a threat to me. This would be difficult to prove since a law school permitted him back on campus. I asked the few students that I trusted for help, and learned that Stephen had multiple violent and aggressive encounters on campus. More troubling was that the school knew about it. Stephen had been removed from campus by security and had been kicked out of class by a female professor prior to my incident.

Had the school told me when I asked that Stephen had been reported to the school and previously removed from campus for similar acts, I would have filed a police report earlier. The school's initial

decision came that December. Stephen's sanctions were grossly inadequate. The school's process was fragmented and tenuous. I knew that an appeal was useless, but I appealed. Stephen's sanctions remained the same. The final decision came more than six months after the incident and a month shy of Stephen's graduation.

I deteriorated under the strain and became depressed. I was forced to confess the circumstances to my family and employer. It was my belief that I could save myself and others through education that sustained me through much adversity, but now I am struggling with demons I don't know how to fight. In shielding Stephen Nesbit, New York Law School has shown me that if you're a woman, particularly a woman of color, not even education will save her.

When I started law school in the part-time evening division, I worked full time at Teach for America and was fulfilling my weekend commitment to the Marines. I had the grit, determination, and discipline to stay on track. After my assault, and the school's final decision to allow Stephen to graduate, I attempted to transfer schools. A year shy of graduation, knowing that my graduation would be delayed, and that I'd incur additional education expenses, I wanted to transfer, because I could not graduate from the same school as my attacker.

I enlisted the help of Dean Crowell and several professors in a four-page letter to assist my transfer for Fall 2015. I left my job of three years, and completed the Pieper Bar Review course, because law schools are most concerned with whether an applicant can pass the bar. The admissions counselor Dean Crowell said would dedicate herself to helping me emailed me the day transfer applications were due. Understandably, professors were reluctant to give a recommendation letter to a student who was leaving because she was attacked on the campus where they were employed. August 2015, I learned that my transfer application would not be considered because it lacked a letter of recommendation from a professor at my current law school.

New York Law School's actions remind me that I am colored, I am a female, and I am a veteran: when I am hurt, it means less; when my blood is shed, it is an acceptable loss; when I cry, it is expected; when I ask for help, I am undeserving; when I speak, I can be ignored; when I write, my words can go unacknowledged. I am reminded that in spite of my military training and that my father was a Marine, I am not without fear: I am afraid of becoming a legal professional that sits behind a desk, but is unwilling to act, and I am afraid to gain a degree and lose my humanity. This is my daily prayer, consolation, and constitution: "We need women who are so strong they can be gentle, so educated they can be humble, so fierce they can be compassionate, so passionate they can be rational, and so disciplined they can be free."

I believe all women are entitled to harassment-free and assault-free higher education institutions. The United States needs the women described by Kavita Ramdas' quote in law, medicine, government, as educators, as athletes, in our military, in our communities, and our universities. Today, we have the privilege and opportunity of educating and cultivating such women. We deserve women in careers who are willing to sacrifice their lives to protect our rights; women who are raw and unapologetic and who aren't acting entitled, but who demonstrate that we are entitled to be here and everywhere. Women who don't wait for men to open doors, we kick them in; women who don't ask for a seat at the table, we build a table. I believe that you, Congresswoman, are that woman, and that with your support, this bill can get passed.  Thank you.

THE WHITE HOUSE

WASHINGTON

March 4, 2016

Ms. Theresa Giovanna Bailey
New York, New York

Dear Theresa:

Sexual assault is an affront to our basic decency and humanity, and I admire your courage in sharing your story.  This issue affects all of us, and is about the safety of those we love most: our moms and our wives, our daughters and our sons.

I want every sexual assault victim to know they are not alone, and that I stand with them. As long as I hold this Office, I will do everything I can to address these crimes no matter where they occur—from our neighborhoods and college campuses to military bases and tribal lands.

As a Nation, we must teach young people that sexual assault is simply unacceptable, and we must strengthen our criminal justice system so law enforcement can prevent these crimes and bring perpetrators to justice.  We also have to keep reaching out to survivors to make sure they're getting all the support they need to heal.  None of this is going to be easy, but it is necessary. This is a priority for me not only as President, but also as a husband and a father.  That is why I've taken steps to strengthen Federal enforcement efforts and to provide schools with additional tools to combat sexual assault on their campuses.  I have also directed our military leadership to exponentially improve their performance in preventing and responding to these crimes.

Thank you for taking the time to write.  To find more information and resources, including advocacy and survivor services, visit www.WhiteHouse.gov/1is2many and www.NotAlone.gov.  Please know your message will remain in my thoughts in the days and months ahead.

Sincerely,

# EXHIBIT

# F

Dear Mr. Dopico,

My name is Theresa Bailey. October 2014 I was attacked by a male student on New York Law School's campus. I reported the incident to New York Law School's administration. Due to the action and inaction of attorneys Anthony Crowell, Deborah Archer, Howard S. Meyers, Erica L. Wood, and Jeffery Becherer, I have lost the opportunity of a fair chance to have my attacker prosecuted under the American legal system.

Since the incident, I have diligently tried to remedy the situation using every means available to me, outside of pursuing legal action or making the incident front page news. I have exhausted all such remedies, and now my effort has led me to write to you.

Either maliciously, negligently, or incompetently, the named attorneys have knowingly obstructed justice against my attacker, Stephen Nesbit, in dereliction of the rules of conduct governing lawyers. I ask for your help to end my suffering and to protect others from a similar fate.

I have included letters that I submitted to New York Law School about my attack. I informed Anthony Crowell and Deborah Archer that my incident had been mishandled by the school. Specifically, I complained that I was told my attacker was no longer on campus. Period. I was also told that the school had no knowledge that Stephen posed a threat or was the subject of similar complaints. Weeks later, Stephen was brought back to campus, and I learned from students that Stephen had previously been reported to NYLS for similar conduct that I alleged in my complaint to NYLS.

I trusted Anthony Crowell and Deborah Archer with overseeing the investigation of my complaint into how the school handled my allegations against my attacker. Had I not been misled, I would have gone to the police and initiated legal action when the evidence against my attacker was still intact. My attacker appeared to be on a strong drug when he attacked me, and this evidence could not reliably be collected after two weeks, which my school's administration undoubtedly knew.

Howard Meyers, Erica Wood, and Jeffery Becherer were involved in investigating the incident, as members of the New York Law School Harassment and Discrimination Review Board.

My attacker was allowed to circumvent New York Law School's own process by failing to appear for hearings, which meant he could not be questioned by the panel convened to render a decision on the matter. Also, the independent examination which New York Law School told me was used to determine whether Stephen was a danger to himself and others, was conducted after Stephen was permitted on campus. I was only allowed to review this document during the hearing, but I am almost certain that this examination was conducted only after my attacker was permitted to rejoin classes, and after I made a police report against him.

I do not share that delusion of most law students that they are the smartest in the room. In fact, I have received a low grade education at New York Law School, and that is why I am in a predicament where I must ask for your help. What has happened to me by the acts of these attorneys at New York Law School is un-American, unethical, and illegal, and I am relying on the help on those smarter than I am to prove it.

Fall 2015, the semester that I agreed to be reinstated at New York Law School, was my worst semester in my law school career. I was failed in one course and received a D+ in another course for that semester. It is too convenient and cute that I had my worst semester after I used social media to bring awareness to what happened to me at the school. I have requested a review of the grades, and am awaiting an update from New York Law School. There is a small possibility that I was so adversely impacted by what happened to me, and those grades are the result, however, I do not believe that to be the case.

So, as my peers prepare to graduate from New York Law School this May, I will not attend my own graduation. I have found the administration of New York Law School to be lacking the moral fiber that is the backbone of the American legal system. These attorneys have chosen to place New York Law School's reputation and profits over justice, and I cannot participate further in their hypocrisy. Instead, I will stand in solidarity with women that have been victimized on college grounds, but have not seen justice. I respectfully request that you look into the conduct committed and take appropriate action.

Sincerely,
Theresa Bailey

**DEPARTMENTAL DISCIPLINARY COMMITTEE**
SUPREME COURT, APPELLATE DIVISION
FIRST JUDICIAL DEPARTMENT
61 BROADWAY
NEW YORK, NEW YORK 10006
(212) 401-0800
FAX: (212) 287-1045 (NOT FOR SERVICE OF PAPERS)

ERNEST J. COLLAZO, ESQ.
CHAIRMAN

POLICY COMMITTEE MEMBERS
RALPH C. DAWSON, ESQ.
CHARLOTTE MOSES FISCHMAN, ESQ.
ROBERT L. HAIG, ESQ.
BRIAN C. McK. HENDERSON
MYRON KIRSCHBAUM, ESQ.
ALAN LEVINE, ESQ.
HON. EUGENE L. NARDELLI
CARLA A. KERR STEARNS, ESQ.
HON. JOSEPH P. SULLIVAN
STEPHEN L. WEINER, ESQ.

COMMITTEE MEMBERS
DANIEL R. ALONSO, ESQ.
ROBERT J. ANELLO, ESQ.
DAVID ARROYO, ESQ.
MARJORIE E. BERMAN, ESQ.
MICHAEL I. BERNSTEIN, ESQ.
THOMAS BIRNBAUM
JOYCE M. BOVE
JASON CANALES, ESQ.
JOHN H. CARLEY, ESQ.
HON. JAMES M. CATTERSON
VINCENT T. CHANG, ESQ.
CATHERINE A. CHRISTIAN, ESQ.
DANIEL D. CHU, ESQ.
RICHARD J. CONDON
LEONARD F. DELUCA
JOHN M. DESIDERIO, ESQ.
RITA DiMARTINO
PAUL F. DOYLE, ESQ.
PETER G. EIKENBERRY, ESQ.
WILLIAM P. FRANK, ESQ.
GARY D. FRIEDMAN, ESQ.
MATTHEW GAIER, ESQ.
DARRELL S. GAY, ESQ.
PETER C. HARVEY, ESQ.
DEESHA M. HILL, ESQ.
JOHN J. JEROME, ESQ.
RICHARD M. KENNY, ESQ.
DANIELLE C. LESSER, ESQ.
MARIA D. MELENDEZ, ESQ.
CHARLES G. MOERDLER, ESQ.
DANIEL F. MURPHY, JR., ESQ.
FREDRIC S. NEWMAN, ESQ.
RICARDO E. OQUENDO, ESQ.
PABLO QUINONES, ESQ.
ABIGAIL T. REARDON, ESQ.
LEE S. RICHARDS, III, ESQ.
ROLAND G. RIOPELLE, ESQ.
BARBARA K. ROTHSCHILD
WILLIAM T. RUSSELL, JR., ESQ.
BARBARA A. RYAN, ESQ.
KATHLEEN M. SCANLON, ESQ.
EUGENE P. SOUTHER, ESQ.
EDWARD M. SPIRO, ESQ.
SHEEA T. SYBBLIS, ESQ.
ANNE C. VLADECK, ESQ.
FRANK H. WOHL, ESQ.
RICHARD R. ZAYAS, ESQ.
GONZALO S. ZEBALLOS, ESQ.

JORGE DOPICO
CHIEF COUNSEL

SPECIAL TRIAL COUNSEL
JEREMY S. GARBER

DEPUTY CHIEF COUNSEL
ANGELA CHRISTMAS
NAOMI F. GOLDSTEIN
VITALY LIPKANSKY
RAYMOND VALLEJO

STAFF COUNSEL
KEVIN P. CULLEY
KEVIN M. DOYLE
PAUL L. FRIMAN
JUN H. LEE
NORMA I. LOPEZ
NORMA I. MELENDEZ
ELISABETH A. PALLADINO
KATHY W. PARRINO
LANCE E. PHILADELPHIA
ORLANDO REYES
YVETTE A. ROSARIO
REMI E. SHEA

April 28, 2016

<u>PERSONAL AND CONFIDENTIAL</u>

Theresa Bailey
1809 7th Avenue, Apt. 4 D
New York, NY 10028

Re: Matter of Anthony W. Crowell, Esq.
    Docket No. 2016.0637

Dear Ms. Bailey:

    We have reviewed your complaint of professional misconduct by the above referenced attorney. The complaint does not allege a violation of the disciplinary rules governing lawyers. Thus, we have closed our file on this complaint and will take no further action.

    In particular, the allegations made against Anthony Crowell regarding New York Law School's investigative and disciplinary procedures as they relate to the incident of October 6, 2014, fall outside the New York Rules of Professional Conduct. While the Committee understands that you are displeased by the manner in which New York Law School handled your complaint, the Committee is not the proper venue to address this grievance. Accordingly, if you have not already done so, you may consider consulting counsel concerning any legal remedies you may have.

Very truly yours,

Jorge Dopico
Chief Counsel

JD:RES

**DEPARTMENTAL DISCIPLINARY COMMITTEE**
SUPREME COURT, APPELLATE DIVISION
FIRST JUDICIAL DEPARTMENT
61 BROADWAY
NEW YORK, NEW YORK 10006
(212) 401-0800
FAX: (212) 287-1045 (NOT FOR SERVICE OF PAPERS)

ERNEST J. COLLAZO, ESQ.
CHAIRMAN

POLICY COMMITTEE MEMBERS
RALPH C. DAWSON, ESQ.
CHARLOTTE MOSES FISCHMAN, ESQ.
ROBERT L. HAIG, ESQ.
BRIAN C. MCK. HENDERSON
MYRON KIRSCHBAUM, ESQ.
ALAN LEVINE, ESQ.
HON. EUGENE L. NARDELLI
CARLA A. KERR STEARNS, ESQ.
HON. JOSEPH P. SULLIVAN
STEPHEN L. WEINER, ESQ.

COMMITTEE MEMBERS
DANIEL R. ALONSO, ESQ.
ROBERT J. ANELLO, ESQ.
DAVID ARROYO, ESQ.
MARJORIE E. BERMAN, ESQ.
MICHAEL I. BERNSTEIN, ESQ.
THOMAS BIRNBAUM
JOYCE M. BOVE
JASON CANALES, ESQ.
JOHN H. CARLEY, ESQ.
HON. JAMES M. CATTERSON
VINCENT T. CHANG, ESQ.
CATHERINE A. CHRISTIAN, ESQ.
DANIEL D. CHU, ESQ.
RICHARD J. CONDON
LEONARD F. DELUCA
JOHN M. DESIDERIO, ESQ.
RITA DIMARTINO
PAUL F. DOYLE, ESQ.
PETER G. EIKENBERRY, ESQ.
WILLIAM P. FRANK, ESQ.
GARY D. FRIEDMAN, ESQ.
MATTHEW GAIER, ESQ.
DARRELL S. GAY, ESQ.
PETER C. HARVEY, ESQ.
DEESHA M. HILL, ESQ.
JOHN J. JEROME, ESQ.
RICHARD M. KENNY, ESQ.
DANIELLE C. LESSER, ESQ.
MARIA D. MELENDEZ, ESQ.
CHARLES G. MOERDLER, ESQ.
DANIEL F. MURPHY, JR., ESQ.
FREDRIC S. NEWMAN, ESQ.
RICARDO E. OQUENDO, ESQ.
PABLO QUINONES, ESQ.
ABIGAIL T. REARDON, ESQ.
LEE S. RICHARDS, III, ESQ.
ROLAND G. RIOPELLE, ESQ.
BARBARA K. ROTHSCHILD
WILLIAM T. RUSSELL, JR., ESQ.
BARBARA A. RYAN, ESQ.
EUGENE P. SOUTHER, ESQ.
EDWARD M. SPIRO, ESQ.
SHEEA T. SYBBLIS, ESQ.
ANNE C. VLADECK, ESQ.
FRANK H. WOHL, ESQ.
RICHARD R. ZAYAS, ESQ.
GONZALO S. ZEBALLOS, ESQ.

JORGE DOPICO
CHIEF COUNSEL

SPECIAL TRIAL COUNSEL
JEREMY S. GARBER

DEPUTY CHIEF COUNSEL
ANGELA CHRISTMAS
NAOMI F. GOLDSTEIN
VITALY LIPKANSKY
RAYMOND VALLEJO

STAFF COUNSEL
SINAN AYDINER
KEVIN P. CULLEY
SHERINE F. CUMMINGS
KEVIN M. DOYLE
PAUL L. FRIMAN
JUN H. LEE
NORMA I. LOPEZ
NORMA I. MELENDEZ
ELISABETH A. PALLADINO
KATHY W. PARRINO
LANCE E. PHILADELPHIA
ORLANDO REYES
YVETTE A. ROSARIO
REMI E. SHEA

May 25, 2016

PERSONAL AND CONFIDENTIAL

Theresa Bailey
1809 7th Avenue, Apt 4 D
New York, NY 10026

Re:    Matter of Jeffrey P. Becherer, Esq.
        Docket No. 2016.0613

Dear Ms. Bailey:

   This will acknowledge receipt of your request for reconsideration of your complaint, closed by the Committee, in the above referenced matter. A different Committee Member than the one who initially reviewed your complaint will reconsider it now. You will be advised in writing when the Committee reaches a decision in this matter.

   Thank you for your patience.

               Very truly yours,

               Jorge Dopico
               Chief Counsel

Recon-Open

# G

# EXHIBIT



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26TH FLOOR
NEW YORK, NEW YORK 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

June 3, 2016

Theresa Bailey
1809 7th Avenue
New York, New York 10026

Re:    Case No. 02-16-2208
       New York Law School

Dear Ms. Bailey:

On April 25, 2016, the U. S. Department of Education, New York Office for Civil Rights (OCR) received the above-referenced complaint you filed against the New York Law School (the School). You alleged that the School discriminated against you on the bases of your race (African American) and sex by failing to respond appropriately to a complaint of sexual harassment that you filed with the School in October 2014 (Allegation 1). You also alleged that throughout the fall 2015 semester, your family law professor discriminated against you on the bases of your race and sex, or, in the alternative, retaliated for your prior complaint of sexual harassment, by treating you differently from other students (Allegation 2). You also alleged that in or about December 2015, the School retaliated against you for your prior complaint of sexual harassment by assigning you a failing grade and a D+ for two courses in which you were enrolled during the fall 2015 semester (Allegation 3).

Based on the information you provided in your complaint and supplemental documentation, OCR has determined that your complaint is inappropriate for investigation for the reasons set forth below.

With respect to Allegation 1, OCR has determined that your allegation is untimely. OCR requires that complaints be filed with OCR within 180 calendar days of the alleged discriminatory event, or 60 days after the complainant became aware of the alleged discrimination, unless the time for filing is extended by this office. The information you provided indicates that the last act of discrimination of which you are complaining occurred during academic year 2014-2015, which is more than 180 calendar days from the filing of your OCR complaint on April 25, 2016.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by
fostering educational excellence and ensuring equal access.*

In your complaint you requested a waiver of the timeliness requirement. You stated that you did not file Allegation 1 at an earlier date because you were not aware of OCR's existence prior to a response you received from a letter you wrote to the White House regarding Allegation 1, informing you of OCR's existence. You also stated that you had believed your remedies were limited to filing a lawsuit against the School, which you were "really scared" to do. Based on the information you provided, OCR determined that the circumstances you described do not warrant a waiver of the timeliness requirement. Accordingly, OCR has dismissed Allegation 1 as of the date of this letter.

With respect to Allegations 2 and 3, you informed OCR that you raised the same allegations in a complaint filed with the School's legal grievance committee in March 2016; and a complaint you filed with the Supreme Court of New York on April 21, 2016. You advised OCR that your complaints in these other forums are currently pending. Pursuant to OCR's case processing procedures, when a complainant has filed the same allegations against the same recipient with a state court or through a recipient's internal grievance procedures, and OCR anticipates that there will be a comparable resolution process under comparable legal standards (i.e., all allegations will be investigated, appropriate legal standards will be applied, and any remedies secured will meet OCR's standards), OCR will dismiss the OCR complaint. OCR has concluded that it would be inappropriate to continue processing allegations that are pending in another forum, as any remedies you obtain in connection with your pending complaint with the aforementioned entities will likely have bearing on the disposition of the allegations in the instant complaint filed with OCR. Accordingly, OCR has dismissed Allegations 2 and 3, and has closed your complaint as of the date of this letter.

However, you may re-file Allegation 2 or 3 with OCR within 60 days of the date of the aforementioned entities' final determination if you are not satisfied with the outcome. Generally, OCR will not conduct its own investigation in such an instance; instead, OCR will review the results of the other entities' actions and determine whether the other entities provided a comparable process and met appropriate legal standards.

This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. You may have the right to file a private suit in federal court whether or not OCR finds a violation.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information, which, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

If you have any questions, please contact Michele Ginter-Barbara, Compliance Team Investigator, at (646) 428-3816 or michele.ginter-barbara@ed.gov; or Eric Bueide, Compliance Team Attorney, at (646) 428-3851 or eric.bueide@ed.gov.

Sincerely,

*Crystal K. Johnson*
for Erin Emery
Compliance Team

# H

# EXHIBIT



**UNITED STATES MARINE CORPS**
6TH COMMUNICATION BATTALION
FORCE HEADQUARTERS GROUP
MARINE FORCES RESERVE
MCRC FLOYD BENNETT FIELD
BROOKLYN NY 11234-7097

1320
S-1
7 Sep 13

From:   Inspector Instructor, 6th Communication Battalion
To:     Private First Class Theresa G. Bailey 1376617668/0111 USMCR

Subj:   TRANSFER TO THE INDIVIDUAL READY RESERVE (IRR)

Ref:    (a) Your request of 20130408
        (b) MCO P1001R.1K

1.  Effective 8 September 2013, you are hereby transferred to the IRR.  Your
service record book will be administratively closed out and mailed to the
Commanding General, Marine Forces Reserve, 2000 Opelousas Avenue, New
Orleans, LA 70146.

2.  You have given your permanent mailing address as 104-60 Queens Blvd. Apt
10M, Forest Hills NY 11375.  Phone number (917) 697-3996.

3.  As a member of the IRR, you are not required to attend drills but, you are
required to keep the Commanding General, Marine Force Reserve informed of
your current address, marital status, number of dependents, civilian
occupation and physical standards.  Additionally, you must ensure all
uniforms are properly maintained in a serviceable condition.  You are still
subject to active duty recall and mandatory annual screening.  If you have
any questions concerning your status, you may write the Commanding General,
Marine Forces Reserve, IRR Branch, 2000 Opelousas Street, New Orleans, LA
70146 or call toll free (800) 255-5082.

4.  No travel is authorized in the execution of these orders.

5.  Please safeguard this document with your other important papers.

M. DELICE
By direction

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD.
SAFEGUARD IT.

ANY ALTERATIONS IN SHADED AREAS
RENDER FORM VOID

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| 1. NAME (Last, First, Middle) BAILEY THERESA GIOVANNA | 2. DEPARTMENT, COMPONENT AND BRANCH USMCR (K1) | 3. SOCIAL SECURITY NUMBER |
|---|---|---|

| 4a. GRADE, RATE OR RANK PFC | b. PAY GRADE E-2 | 5. DATE OF BIRTH (YYYYMMDD) 19841220 | 6. RESERVE OBLIGATION TERMINATION DATE (YYYYMMDD)   20161022 |
|---|---|---|---|

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY BROOKLYN, NY 11252-6700 | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) 1809 7TH AVENUE APT 4D NEW YORK, NY 10026 |
|---|---|

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND PASCOL MCCSSS PSC BOX 20041 CAMLEJ NC 28542-0041 | b. STATION WHERE SEPARATED MCCSSS PSC BOX 20041 CAMLEJ (RUC 31319) |
|---|---|

| 9. COMMAND TO WHICH TRANSFERRED SEE BLK 18 | 10. SGLI COVERAGE ☐ NONE AMOUNT: $ 400,000.00 |
|---|---|

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| | a. DATE ENTERED AD THIS PERIOD | 2008 | 11 | 17 |
| | b. SEPARATION DATE THIS PERIOD | 2009 | 05 | 13 |
| 0151- ADMINISTRATIVE CLERK | c. NET ACTIVE SERVICE THIS PERIOD | 00 | 05 | 27 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 00 | 00 | 00 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 00 | 00 | 00 |
| | f. FOREIGN SERVICE | 00 | 00 | 00 |
| | g. SEA SERVICE | 00 | 00 | 00 |
| | h. EFFECTIVE DATE OF PAY GRADE | 2008 | 11 | 17 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) RIFLE MARKSMEN  BADGE NATIONAL DEFENSE MEDAL | 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) ADMINISTRATIVE CLERK CRS (01T) 4 WKS/0509 |
|---|---|

| 15a. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | ☐ YES | ☒ NO |
|---|---|---|
| b. HIGH SCHOOL GRADUATE OR EQUIVALENT | ☒ YES | ☐ NO |

| 16. DAYS ACCRUED LEAVE PAID   RLB: 5.5 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | ☐ YES | ☒ NO |
|---|---|---|---|

| 18. REMARKS |
|---|
| NOT A FINAL DISCHARGE BLK 9 CONTD COMMANDING OFFICER HQ CO, 6TH COMM BN 4TH MLG MCRC, FLOYD BENNETT FIELD BROOKLYN, NY 11234 (RUC 21681) NON-CREDITABLE DELAYED ENTRY PROGRAM TIME (00 00 24) 31319-2009-00233 |

The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program.

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code) 45 WALL STREET PENTHOUSE #4 NEW YORK, NY 10005 | b. NEAREST RELATIVE (Name and address - include ZIP Code) SHERRY E. BAILEY (M) SAME AS BLK 7b |
|---|---|

| 20. MEMBER REQUESTS COPY 6 BE SENT TO | NY   DIRECTOR OF VETERANS AFFAIRS | ☒ YES | ☐ NO |
|---|---|---|---|

| 21. SIGNATURE OF MEMBER BEING SEPARATED *Theresa Bailey* | 22. OFFICIAL AUTHORIZED TO SIGN (Type name, grade, title and signature) V. R. COURT, YC-01, ASSISTANT PERSO   *VR Court* |
|---|---|

| SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only) |
|---|

| 23. TYPE OF SEPARATION Released from IADT | 24. CHARACTER OF SERVICE (Include upgrades) HONORABLE |
|---|---|

| 25. SEPARATION AUTHORITY MARCORSEPMAN PAR 1005 | 26. SEPARATION CODE MBK2 | 27. REENTRY CODE N/A |
|---|---|---|

| 28. NARRATIVE REASON FOR SEPARATION COMPLETION OF REQUIRED ACTIVE SERVICE (IADT) USMCR |
|---|

| 29. DATES OF TIME LOST DURING THIS PERIOD (YYYYMMDD) NONE | 30. MEMBER REQUESTS COPY 4 (Initials) |
|---|---|

**DD FORM 214, FEB 2000**     PREVIOUS EDITION IS OBSOLETE.     **MEMBER - 4**

I

EXHIBIT

I



# Manhattan

Daily News, Sunday, December 9, 1984

CLASSIFIED ADS IN THIS SECTION

# Helping new type of homeless women

**By JENNIFER CALDWELL**

SHERRY BAILEY expects her third child late this month. Pregnancy should be old hat. Instead, she shleps to government agencies almost every weekday, pleading with case workers to help her find a place to live.

Any time now, the ride to Bellevue Hospital to give birth may be a ride of heartbreaking sorrow, because if Bailey doesn't have an apartment to go to when she leaves the hospital, her child will be taken away and placed in foster care.

Bailey's problems are not unique. In fact, she is part of a trend—women in the "middle-aged group" who are down on their luck and homeless—a class of women you wouldn't have seen in a women's shelter even 10 years ago.

Not long ago, the typical resident was an older alcoholic, according to Ida R. Sharpe, the director of a women's shelter at 305 Lafayette St. Today, 60% of the women living in shelters are between 21 and 49 years old, when, traditionally, they would be loath to admit they were in such dire straits, even more loath to seek haven in a women's shelter. "Econo-

## The typical resident of shelter 10 years ago was an older alcoholic, but experts see more of 'middle-age' group

mics, that's the bottom line," Sharpe said. "Some of the women do have mental problems, some do have drug problems. But a lot of the people whom we call 'homeless' wouldn't be without a home if there was low-cost housing, and work programs. There is not enough low-cost housing.

"So now, we have a lot of women in their 30s and 40s that we wouldn't have seen before," Sharpe said.

Most have been living a hair's breadth from the street. The last straw that breaks their lives falls in different ways: eviction, abandonment, injury, a man's physical abuse.

Bailey left her apartment fast, of her own "choice," if "choice" in-

cludes running away from a boyfriend who beat her in an attempt to induce a miscarriage.

"He wanted me to have an abortion and I wouldn't," she said of the man who fathered her unborn child and one of her two other children.

When a desperate Bailey phoned a crisis line for help, she was told to take her two children and get out fast.

She didn't find out until after she ran away, she said, that in declaring homelessness at a service agency meant she would have to give up her two children to foster care until she had a place to live. She left them with her mother.

BAILEY, 28, SAYS, "I'm educated, I can type." But she's in a "Catch-22" situation. She has neither a job nor an apartment, and has learned that it's darn hard to get one without the other.

To shelter workers, Bailey's woes are just one in 50—the number of women who live, for an average of two months, at the cost of $29 a day, in the red brick building at the corner of Bond St. It is a last resort for women down on their luck.

Wanda, 54, is a divorced woman receiving no alimony. She arrived at

See **SHELTER** Page 3